# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

DONNELL BROOKS, SR.,

    *Plaintiff,*

  vs.                                  Case No. 21-2098-EFM

FRITO-LAY, INC.,

    *Defendant.*

## MEMORANDUM AND ORDER

Plaintiff Donnell Brooks brings this action against Defendant Frito-Lay, Inc., under 42 U.S.C. § 1981, alleging he was subjected to racial discrimination, a hostile working environment, and retaliation while he was employed at Defendant's Topeka, Kansas, warehouse. Defendant has moved for summary judgment on Plaintiff's claims (Doc. 34). In the present Order, the Court grants in part and denies in part Defendant's motion.

### I.    Factual and Procedural Background[1]

Plaintiff began working for Defendant in 2011 as a part-time employee and earned $18.94 per hour. After about a year, he began working full-time at Defendant's Topeka, Kansas warehouse on the pick belt and did so for approximately one year.

---

[1] In accordance with summary judgment procedures, the Court has set forth the uncontroverted facts, and they are related in the light most favorable to the non-moving party.

The warehouse has an A side, where trucks are loaded and unloaded, and a B side, where workers pick specific items.

The pick belt is a 24-hour operation, manned by other employees on other shifts when Plaintiff's shift has ended.  Plaintiff mainly worked on the pick belt on the B side of the Warehouse, although he alternated between working on the pick belt and working in loading. Plaintiff earned $20.65 per hour at the time his employment with Defendant ended.

Jason Kennedy and Sara Specht supervised Plaintiff. Plaintiff did not report any complaints or grievances with human resources or with management during his first year of working on the pick belt.

Throughout Plaintiff's employment, Defendant maintained various policies and procedures that not only governed Plaintiff's employment, but also detailed Defendant's expectations for its employees.

No medical provider has prescribed Plaintiff with any medicine or treatment related to his employment with Defendant.

Despite alleging it in his Complaint, Plaintiff admitted he does not believe he received inadequate training or was subjected to close monitoring or frequent verbal warnings during his employment with Defendant. Similarly, despite alleging it in his Complaint, Plaintiff admitted he does not believe he received excessive overtime.

A.      **Work on the Pick Belt**

Plaintiff believes Defendant discriminated against him because of his race by having him work on the pick belt.  Plaintiff states that he worked on the pick belt 75% of the time.  He also states that there were 42 people working in the general area, and that a majority of the white employees never worked the pick belt.

Plaintiff has no personal knowledge of the race or ethnicity of other employees who worked on the pick belt during other shifts.  Defendant has produced some evidence showing that non-black employees have also worked on the pick belt.  However, Defendant has not presented evidence of the actual percentage of pick belt workers by race.

It is uncontroverted that it was typical for an employee who worked on the pick belt to perform that work for their entire shift. It was not typical to rotate employees who worked on the pick belt to work in other areas of the warehouse.

Plaintiff believes working on the pick belt and stacking are the most difficult jobs at the warehouse.  Defendant points out that in another portion of his deposition, Plaintiff agreed this belief reflects his own opinion. However, the Court does not find that it is unfair speculation for an employee, with extensive personal experience at a variety of jobs, to describe their relative difficulty.

During the summer, the temperature in the pick belt area exceeds 90 degrees.  Plaintiff has stated that he had two heat-related injuries while working on the pick belt.  Plaintiff testified that most workers would agree the pick belt work is one of the most physically demanding in the warehouse.  However, he agreed when asked that he has not "polled everyone" on the issue.

Once after working the pick belt for four days in a row, Plaintiff spoke with his supervisor Jason Kennedy.  He also spoke with another supervisor, Vern Siegel, about having to work the pick belt.  Plaintiff did not otherwise report any complaints or grievances to Siegal regarding race discrimination, hostile work environment, or retaliation during his employment with Defendant.

Other than the pick belt assignments, Plaintiff has no other complaints of discriminatory conduct by supervisor Max Kleiner.  Kleiner, according to Plaintiff, was "always putting the

black workers on the pick belt." Although he did not expressly tell Plaintiff that this was because they were black, his selections were "his repeated behavior."

Defendant argues that Plaintiff is only speculating that Kleiner prepared the pick belt schedules, and that he did not formally file a Speak Up complaint about Kleiner. However, Plaintiff testified he asked Kleiner about the scheduling, and Kleiner said he did the scheduling. Supervisor Sara Specht said the same thing. Plaintiff further testified that he did speak to Specht directly to complain about the scheduling. According to Plaintiff, "every time I went to HR I mentioned Matt Kleiner, Matt Kleiner, Matt Kleiner."

According to Plaintiff, whenever he complained about the pick belt, his assignments there would "lighten up a little bit," but then it would pick back up.

Other than the burdensome nature of the pick belt assignments, Plaintiff has not identified any adverse effect from racial discrimination. Plaintiff does not know of Kleiner ever using a racial epithet towards anyone at Frito-Lay.

In support of his pick belt work claim, Plaintiff has also cited the experiences of two other African-American employees, Ranaldo Miles and Paris Dunmars. Miles and Dunmars were co-plaintiffs in the present action; their claims were dismissed following a settlement with Defendant.

Miles and Dunmars worked with Plaintiff on the first shift in the B side of the warehouse. According to Plaintiff, Miles and Dunmars told him that they believed that they were being discriminated against because they were typically assigned the most physically demanding tasks, including loading trucks and working the pick belt. Defendant objects to such testimony as hearsay, but Plaintiff also states that he "observed himself" the restriction of Miles and Dunmars to physically demanding tasks.

As noted earlier, Defendant challenges Plaintiff's testimony about the relative difficulty of working the pick belt as inadmissible speculation. But the two cases cited by Defendant are not directly relevant here. In the first, *Bones v. Honeywell Int'l, Inc.*,[2] the court rejected as speculative the plaintiff's testimony about the motives behind his supervisors' actions, observing "[t]he mere act of firing an injured employee for excessive absences or for violation of an absenteeism policy does not implicate an improper retaliatory motive, particularly when the decision-makers were not aware that the absences were due to work-related injuries."[3]

In the second case, *Self v. Crum*,[4] a inmate sued the jail's treating physician for failing to detect his heart condition. The court affirmed the dismissal of the inmate's claim, in part because the inmate's Eighth Amendment claim required a showing of deliberate indifference to medical needs. The court observed that the plaintiff inmate presented with "vague symptoms" which did not "obviously point to a substantial risk of harm."[5] Thus, "[w]hile Crum's medical judgment may constitute negligence or medical malpractice, it would amount to mere speculation to conclude Crum had a culpable state of mind."[6]

Here, Plaintiff is not offering speculation about another person's motive or state of mind. He is describing the relative physical difficulty of a job which he personally worked. Such testimony is not improper speculation.

---

[2] 366 F.3d 869 (10th Cir. 2004).

[3] *Id*. at 876.

[4] 439 F.3d 1227, 1236 (10th Cir. 2006).

[5] *Id*. at 1235.

[6] *Id.*

Dunmars called the Frito-Lay's Speak Up line to complain about discriminatory treatment, including being assigned the most physically demanding tasks. This complaint was investigated by HR Director Brent Banwart, who spoke with Miles on September 19, 2019. Banwart reported that Miles, Dunmars, and Plaintiff

> felt profiled by Jason [Kennedy]. Jason was always watching these employees and always had something to say regarding their work . . . . Ranaldo [Miles] feels they are getting the most difficult trailers to load and were not rotated like FT employees.

Banwart addressed the issue with Kennedy:

> regarding the concern and the perception that employee(s) are feeling harassed and discriminated by his actions. Ultimately, Jason's perspective echoed Casey [Arganbright's] feeling regarding the matter, in that, Leads schedule the work of the associates and the scheduling is random with the exception that some FT employees are assigned 'doors' frequently. Also, Jason was surprised regarding the accusation of 'more difficult work' since all employees loading trailers must work continuously for 7.5 hours. We discussed the feeling that policies are not being consistently administered and Jason felt he has been consistent but was willing to be self-reflective and confirm the consistent administration of policies.

Banwart concluded:

> Regarding the distribution of work, currently, the work is assigned randomly by Leads and in some cases, employees are frequently assigned the same 'door'. I challenged Casey and Jason to review the work to determine if some assignments are more physically taxing or perceived more difficult and if we can rotate 'door' assignments. This could improve moral[e], engagement and the perception of fairness.

Dunmars testified that while he was working in the Topeka plant, he was assigned either to work on the pick belt with Brooks, or to load the trailers with Miles. He testified that no white employees were assigned to work on the pick belt during his shift, and that the pick belt was "one of the most physical[ly] demanding jobs in the warehouse."

Dunmars testified that he and Miles were typically assigned to work at Doors 61 and 62, which involved the hardest loading. No white employees were assigned to load at Doors 61 and

62 during his shift.  Defendant argues that Dunmars did not so testify, but the cited portion of his deposition does not support this contention:

> Q.   As I understand your claim every — trailer — excuse me.  Door 61 and 62 you believe you were given simply because you were black because it was the hardest work in you opinion, correct?
>
> A.   Correct.
>
> Q.   Okay.  Now, you didn't worked on 61 and 62 every day, did you, sir?
>
> A.   No.
>
> Q.   And when you didn't worked on 61 and 62 isn't it true that there were at times white employees that worked on 61 and 62?
>
> A.   No.
>
> Q.   Then how did 61 and 62 get done, sir, if you weren't there?
>
> A.   It was a black employee in there, Ranaldo [Miles].

Miles similarly testified that he was typically assigned to load trailers at door 62, which involved a lot of product needing to be stacked, and that the job was given to himself, Dunmars, "or other African-Americans."

## B.    Lead Position

Plaintiff has alleged that race played a role in Defendant's not awarding him a lead position in 2015 and not granting his request for a transfer to its Aberdeen, Maryland, facility.

However, in his deposition, Plaintiff admitted seniority was not the sole factor Defendant considered in choosing the lead position, admitted he does not know what other factors were used, and does not know the qualifications of any white employees that may have received lead positions.  After he was not chosen for the lead position, a management-level employee at the Facility explained the decision to Plaintiff.

At that time, Plaintiff did not believe his race was a factor in the decision. He admitted he applied for a lead position only once, and never asked anyone what he could do to improve his chances in the future.

Plaintiff identified a black employee, Tim Jacobs, as a worker passed over for a lead position multiple times, but Plaintiff has admitted he has no knowledge regarding Jacobs' disciplinary history, attendance records, or qualifications for the positions.

## C.    Other Employment Opportunities

Plaintiff testified that he did not have a lot of job opportunities during his employment, other than being able to transfer around the plant.  To obtain a different position, an employee must first submit a request to do so, which informs Defendant that an employee wants to work in a different position.

Plaintiff submitted bid sheets during his employment with Defendant to obtain various job opportunities at Frito-Lay. For example, on September 19, 2013, Plaintiff submitted and was awarded a bid for a Primary Machine Operator position that would allow him to run the machines on the production side of the Facility where chips are packaged, and cease working on the pick belt. This was outside of the department he claims is responsible for the alleged discrimination and retaliation.

Plaintiff remained in the Primary Machine Operator position for three to four days.  He voluntarily left this position and returned to working on the pick belt, stating that there was "worse discrimination over there than it was in the warehouse, so I picked the lesser of the two evils."

However, Plaintiff admitted he did not file any complaints or grievances of discrimination or harassment regarding the Primary Machine Operator position by calling

-8-

Defendant's Speak-Up telephone number. He also did not file any complaints to management, human resources, or the EEOC about it.

Plaintiff first began working under Jason Kennedy's supervision on September 21, 2017. Plaintiff was awarded a warehouse pick load position on the first shift on September 21, 2017. For over two years in this position, he was supervised by Kennedy.  During this time, Plaintiff only once tried to transfer to a different area, when he submitted a bid to work as a GES B Operator position.

After his successful bid on October 2, 2019, Plaintiff ceased working under the supervision of Kennedy and Specht.  As a GES B Operator, Plaintiff monitored the shipping of products.  Plaintiff found the GES B Operator position more desirable than the pick belt position, and never worked in the warehouse again.  Once he stopped working on the pick belt, Plaintiff had no contact with Kennedy or Specht that he believes evidences racial discrimination.

Plaintiff believed many of the other available positions at the warehouse required technical knowledge or skills.  Plaintiff admitted he did not take any action outside of his employment with Defendant to obtain the skills he believes he required to work in other positions at the warehouse.

Plaintiff testified that looked at the bid boards for the plant "at least twice a week," but acknowledged that he did not look at every biddable position at the facility.

**D.**    **Transfer Request**

In 2017, Plaintiff first talked to Karen Helton about transferring to the Frito-Lay plant in Aberdeen, Maryland.  Sometime later in 2017, he went back to the Human Resources department in the Topeka plant, and told them that he wanted to transfer to either the Maryland plant, or one in York, Pennsylvania.  He received a printout of the contact person for the plant in Aberdeen.

Plaintiff complains that Helton simply gave him the contact information without explaining the transfer process or "[t]he way you fill out the transfer sheet."

In the summer of that year, Plaintiff went on a vacation to Baltimore. During his vacation, Plaintiff drove to the Aberdeen plant in Maryland, where he talked to an employee in the Human Resources department. The Human Resources employee said that he would talk to his people, and that he would respond in about a week

In late 2017, Plaintiff talked to a male employee in the Human Resources department in the Topeka plant.  Plaintiff does not recall this employee's name, but states that the employee said he had gotten approval for Plaintiff's transfer to three other Frito-Lay plants, including Aberdeen.  The employee told Plaintiff to come into his office the next day, so that they could talk about the details.

However, when Plaintiff returned the next day, Helton told him the unnamed male employee was out and he should return the following day.  When he again returned, Helton said that the male employee had transferred to St. Louis and was not coming back.  She also said that the Topeka plant had nothing about the transfer.

After some time, Plaintiff again asked for a transfer to the Aberdeen facility, and Defendant submitted a Transfer Interest Form on May 7, 2019.  At that time, Plaintiff was still supervised by Kennedy.  Kennedy wrote that:  (i) Defendant did not believe Plaintiff had a problem with attendance; (ii) Plaintiff had no disciplinary actions during the past year; (iii) Plaintiff was performing above target; (iv) Plaintiff met the qualifications for the job to which he applied at the Aberdeen, Maryland, location.  Kennedy recommended Plaintiff for the requested transfer.

Plaintiff testified that the veracity of the information Jason Kennedy included on the Transfer Interest Form could impact his ability to obtain the requested transfer.  In subsequent communications regarding the Transfer Interest Form, Defendant was complimentary towards Plaintiff when discussing his work ethic and qualifications. Plaintiff agreed that there was nothing in these subsequent communications showing Defendant discriminated against Plaintiff or otherwise attempted to interfere with his ability to transfer to the Aberdeen, Maryland, location.

Nothing on the Transfer Interest Form supports the assertion that Defendant's actions or inactions inhibited the transfer, and Plaintiff admitted Defendant took action to help with it. Plaintiff spoke about the request separately with Site Director Mark Brinker (the highest-ranking official at the facility), and to Human Resources Directors Anthony Diers and Brent Banwart. Plaintiff did not report experiencing discrimination, harassment, or retaliation.

Plaintiff admitted he does not know the circumstances under which anyone transferred to another location, regardless of their race.  Plaintiff has also admitted the Topeka plant tried to help him get his requested transfer.  He has admitted he has no evidence to suggest that anyone at the Topeka plant told Aberdeen not to hire him.

According to Plaintiff, the unnamed HR employee stated "he had gotten Mr. Brooks approved to transfer" to Aberdeen.  Defendant properly objects to this alleged statemnt as hearsay.  The evidence otherwise establishes that it is the transferee plant which actually approves an employee transfer.  The unnamed HR employee was thus simply reporting a decision made in Maryland to approve the transfer.  "As our Circuit has explained, under our controlling precedent, an employee's statements are not attributable to her employer as a party-opponent admission in an employment dispute unless the employee was involved in the decision

-11-

making process affecting the employment action at issue."[7]  Because Plaintiff has failed to show that either the unnamed Topeka HR department employee or Helton were decision-makers as to the transfer, their alleged comments are properly excluded as hearsay.

Further, Plaintiff directly and explicitly admitted that he has no evidence to support the idea that any action or inaction by anyone employed at the facility played any role in him not receiving the transfer to the Aberdeen, Maryland, location.  He also admitted that when he spoke with Mark Brinker about not getting help with his transfer to the Aberdeen, Maryland, location, he did not mention that he believed he was denied help because of his race or color.

**E.**      **Employees Report a Noose at the Frito-Lay Plant**

In 2013, Plaintiff heard "through the rumor mill that they had found a noose" at the Topeka plant.  Plaintiff never saw the noose or saw any picture of it.  He did not speak with any manager about the rumor.  He did speak with another employee, Quinton Green, who Plaintiff described as "one of the people I talked about with the rumors going on."  Plaintiff does not know how Defendant may have investigated the incident, only that "as far as them going into it like they did [later] on the second one, none of that was never made — made public to the employees.  To me anyway."

On January 15, 2018, which was Martin Luther King Day, employees at the Topeka plant reported finding a hangman's noose.[8]  Plaintiff has admitted he never saw the noose, he only heard about it from Quinton Green.

---

[7] *Lincoln v. BNSF Railway Co*. 2020 WL 4000912, at *17 (D. Kan. 2020) (citations and internal quotations omitted). .

[8] Although Defendant's brief repeatedly refers to this object as "a rope tied in the shape of a slipknot," that term is never used in the specific evidence cited at issue—Plaintiff's deposition.  There, both Plaintiff and counsel consistently refer to the object as a "hangman's noose."  In his deposition, HR Director Anthony Diers, who did see the rope, was asked if a noose "was an accurate description of what the rope was put in to [sic]."  He responded, "It

Defendant investigated the incident within two hours after the noose was reportedly discovered.  During the investigation, Defendant interviewed more than 20 employees.  HR Director Anthony Diers led the investigation for Defendant, and spoke with Travis Deters, the Director of Warehouse Operations. Deters had followed up with the contractors performing construction work in the warehouse, and none of the contractors indicated they used the type of rope used in the noose.  Defendant also reviewed all the available camera footage at the warehouse.

Plaintiff has stated that he believes that Defendant "glossed over" the incident, but admitted he has no personal knowledge on the investigation.  He knows there are cameras in the warehouse but has never worked with the system, and does not know what areas the system covers.  In his deposition, Plaintiff admitted he does not disbelieve that Defendant reviewed the available camera footage at the warehouse and was unable to discern who was responsible for the noose.

Diers prepared a Speak Up Closing Report, which reported that "objectively, our team doesn't want to immediately assume ill intent," but noted that "no contractors lay[] claim to this rope," and there was no "clarified functional business purpose" for the rope that was found.  As a result, Diers stressed, "this is a serious matter."

Defendant held meetings on the incident with all frontline employees at the plant February 6, 2018.  Senior Site Director Brinker and Vice President for Labor Gary Harrison-Ducros spoke.  Plaintiff attended one of these meetings.

---

was tied into a slipknot."  However, given the relevant standard of review, the Plaintiff's testimony, and the day the rope was found (Martin Luther King Day), the Court assumes for purposes of this Order that the rope was fashioned into a hangman's noose rather than a simple slipknot.

As noted earlier, Plaintiff alleges that Defendant "glossed over" the incident, but the only complaint he makes with respect to the meetings held on February 6 was the suggestion by one of the speakers that the noose might have been left by an outside contactor, which he does not believe. Plaintiff suggests in his response to the summary judgment motion that this reticence exists because contractors never worked in the area where the noose was found. However, his deposition testimony undermines the claim. Asked specifically about his personal knowledge relating to the 2018 noose incident, Plaintiff responded, "I can't even remember if there was people, outside contractors, even working over there on—on that side [of the warehouse]." Moreover, the Topeka Frito-Lay plant operates on multiple shifts. Plaintiff has not supplied any other evidence which would show that contractors had no access to the area at the times he wasn't there.

Following its investigation, Defendant altered the production scheduled and slowed production to meet with its employees and provide training.

During these information and training sessions, Defendant asked if anyone had any questions. Plaintiff attended one of these information and training sessions and at no point asked any questions.

Plaintiff did not speak with Anthony Diers about the noose. He did speak about the incident once with Vern Siegal. Plaintiff's response to the motion for summary judgment notes his deposition testimony that, "I talked to Vern once, and the next thing I knew Vern was gone."

The Response fails to note that in his deposition Plaintiff quickly disavowed a cause-and-effect relationship:

Q.   Are you suggesting there's a connection between the two?

> A.   I -- I'm not suggesting. I'm just letting you know that he wasn't there for me to talk to him anymore.

Plaintiff admitted he has no evidence to show any connection between the noose incident and any of the other allegations in his complaint.

## F.   Warehouse Graffiti

Plaintiff contends that he was exposed to racially offensive graffiti in the warehouse bathroom.  Plaintiff was asked if this graffiti ever took the form of any of the various phrases typically associated with racist comments, including the n-word, and he responded, "No."

Instead, there was "stuff up there about Obama."  He explained:

> A.   The thing about Obama was it was, like, make Obama—something about Obama—how in the hell did they say it. It was, like, we get a black—we get a black president or something, and his name is Obama. Which is—you know, it's sort of like saying that—
>
> Q.   He's Muslim?
>
> A.   He wasn't an American, yeah.
>
> . . . .
>
> And then it had—you know, and then it had a picture of, like, this and then it had—you know, with the towel on the head.

When Plaintiff next returned to that bathroom, three or four days later, this graffiti had been cleaned up.

Plaintiff never reported or complained about the graffiti.

## G.   Additional Facts

Plaintiff knew of Frito-Lay's Speak-Up telephone system, but never used it to make a complaint or grievance.  He testified he complained to human resources several times but cannot say to whom he complained or with whom he spoke.  Plaintiff also testified his only complaint to human resources pertained to him working on the pick belt and to get help with his transfer.

Plaintiff never heard any racially offensive comments from his supervisors or from coworkers.

He believes he heard one discriminatory comment from Matt Kleiner. The comment was not directed towards him, did not contain any racial epithet and he did not know the context of the conversation when the comment was allegedly made. "I just came around the corner and I happened to be in earshot," and heard Kleiner asking where all the black workers were. Plaintiff did not report or complain about the alleged comment.

Plaintiff resigned from his employment in September 2020. He submitted a letter which stated he was retiring. The letter gives no indication that Plaintiff was subjected to racial discrimination, a hostile environment, or retaliation. Following his resignation, Plaintiff moved to Maryland in September 2020 so he could live closer to family, and did so without first securing employment.

Approximately one month after moving to the State of Maryland, Plaintiff began working for Gerber Waste Removal in or around October 2020 and earned $18.50 per hour. Plaintiff received a raise in or around October 2021 and currently earns $19.50 per hour.

## II.     Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[9] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[10] The

---

[9] Fed. R. Civ. P. 56(a).

[10] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006) (citation omitted), *overruled on other groun*ds, *Bertsch v. Overstock.com*, 684 F.3d 1023, 1029 (10th Cir. 2012).

-16-

movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[11]   The nonmovant must then bring forth specific facts showing a genuine issue for trial.[12]   These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[13]   The court views all evidence and reasonable inferences in the light most favorable to the non-moving party.[14]

## III.    Analysis

Plaintiff argues Defendant violated 42 U.S.C. § 1981 by discriminating against him on the basis of race, by subjecting him to a hostile working environment, and retaliating against him. To resolve § 1981 discrimination cases, courts apply the same *McDonnell Douglas*[15] framework used for Title VII cases.[16]   Accordingly, Plaintiff must show that (1) he is a member of a protected class, (2) he was qualified for the position at issue, (3) he suffered adverse employment action, and (4) this action was not done to similarly situated employees that are not members of that protected class.[17]   Here, the parties do not contest the existence of the first two elements of a prima face claim.

---

[11] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

[12] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005) (citation omitted).

[13] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998)).

[14] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004) (citation omitted).

[15] 411 U.S. 792 (1973).

[16] *Perry v. Woodward*, 199 F.3d 1126, 1135 (10th Cir. 1999) ("While *McDonnell Douglas* involved a Title VII claim for failure to hire, the analytical framework it pioneered applies equally to claims brought pursuant to section 1981.").

[17] *See Argo v. Blue Cross & Blue Shield of Kan., Inc.* 452 F.3d 1193, 1201 (10th Cir. 2006).

-17-

Once Plaintiff has established his prima facie case of discrimination, the burden shifts to Defendant "to articulate a nondiscriminatory reason for the adverse employment action."[18]  If Defendant satisfies this burden, Plaintiff must then show that Defendant's articulated reason for the adverse employment action is pretextual.[19]

A.    **Discrimination**

Plaintiff argues he was discriminated against by Defendant's failure to transfer him to its plant in Aberdeen, Maryland, and by forcing him to work on the Topeka plant pick belt.  Plaintiff has previously suggested that he was discriminated against when he was not chosen for a lead position.  However, Plaintiff's Response to the summary judgment focuses only on the failure-to-transfer and the pick belt work.

The Court finds that summary judgment is warranted as to Plaintiff's failure-to-transfer claim, as he has failed to show the existence of an adverse job action.  The evidence shows simply that Plaintiff applied for a transfer, that the transfer was approved, but any associated paperwork was lost when the HR manager involved transferred away from the Topeka plant. Plaintiff also has not controverted Defendant's evidence that in any event it is the transferee plant, in this case in Maryland, which makes the decision to accept a transfer, nor has he controverted Defendant's evidence that no one at the Topeka interfered with the transfer. Plaintiff did not renew his request, and there is nothing to suggest that a renewed application would not have been approved.

---

[18] *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1264 (10th Cir. 2001) (citation omitted); *see also McDonnell Douglas*, 411 U.S. at 802.

[19] *Id.* (citation omitted).

The Tenth Circuit has consistently held that only acts causing "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or . . . a significant change in benefits" are considered adverse employment actions.[20]  Plaintiff received a minor set-back in his application for a transfer, and then abandoned the effort.  He has failed to show an adverse employment action with respect to the proposed transfer.

The Court reaches a different result with respect to work on the pick belt.  Plaintiff's testimony establishes that that pick belt work was more difficult than other warehouse assignments.  And, again according to his testimony, that work was disproportionately assigned to black workers.

Defendant does not argue that disproportionate assignment to difficult work would not constitute an adverse employment action.  It argues, rather, that averments made in Plaintiff's Declaration are attempts to create sham fact issues, and that the Declaration's description of experiences of Miles and Dunmars is hearsay.  Defendant argues Plaintiff is simply speculating as to the assignment system, and has not "offered independent evidence to corroborate [his] contention."

With respect to the alleged sham facts, Defendant cites authorities addressing the issue at the most general level.  Thus, Defendant cites Tenth Circuit authority holding that

> "[t]o determine whether a contradicting affidavit seeks to create a sham fact issue, we have looked to three factors: whether:  '(1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly

---

[20] *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1040 (10th Cir. 2011) (citations omitted).

discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain.' " [21]

Defendant argues that exclusion is appropriate because Plaintiff had access to information at the time of his deposition and his attorney was present for cross-examination.

But this misses the threshold inquiry—whether the Declaration is indeed a *contradictory* affidavit.[22]  "The sham affidavit rule does not apply to . . . noncontradictory portions of" affidavits filed in response to a summary judgment motion.[23]

Defendant never explains how any specific portion of the Declaration contradicts specific portions of Plaintiff's prior testimony.  Indeed, Defendant implicitly concedes its request is not targeting contradictory averments when it concludes its argument with the complaint that "Plaintiff now seeks to add new facts to avoid summary judgment."  But that it is the very function of affidavits in response to a motion for summary judgment — presenting new facts not previously addressed in a deposition.

Defendant's hearsay argument is equally unpersuasive.  The Declaration does state that Miles and Dunmars told Plaintiff that they believed their assignments were discriminatory.  But the Declaration is not limited his co-workers' comments alone.  The Declaration states as a fact that Miles was "typically assigned to load the truck trailers with the most product," while Dunmars "was typically assigned to either load the truck trailers with the most product, or to

---

[21] *See Ralston v. Smith & Nephew Richards, Inc*., 275 F.3d 965 (10th Cir. 2001) (quoting *Rios v. Bigler*, 67 F.3d 1543, 1551 (10th Cir. 1995)).

[22] *See Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986) (sham evidence rule applies to witness's reliance on "an affidavit contradicting his own prior testimony").

[23] *SodexoMAGIC, LLC v. Drexel Univ*., 24 F.4th 183, 210 (3d Cir. 2022).

work the pick belt with me."  Further, Plaintiff directly states that "I observed myself that Mr. Miles and Dunmars were typically assigned the most physically demanding tasks."

As noted above, Defendant argues that Plaintiff has failed to show independent corroboration of his arguments regarding the pick belt.  It contends that, after Plaintiff complained about the assignments, Banwart investigated and he believed the work was assigned randomly.  Banwart, Defendant stresses, did "at no point state, intimate, or otherwise suggest Defendant gave preferential treatment" to whites in the work assignment system.

Defendant supplies no authority for the contention that some form of independent corroboration is required at summary judgment.  Plaintiff states he personally observed the assignment system and how it was disproportionately affected black workers.  According to Plaintiff, the pick belt work was not assigned to whites.  Plaintiff also described the relatively onerous nature of the pick belt work, based on his personal experience.  Plaintiff's first-hand observations, by themselves, create a material issue of fact as to the adverse nature of the job assignment.

This apparently race-based system of job assignment lacks any legitimate business reason.  Defendant argues that, after Plaintiff complained about the assignments to the pick belt, their frequency diminished.  But the evidence is that this decrease was only temporary, and soon returned to what they were before.

Finally, Defendant stresses that Plaintiff conceded in his deposition that he was not aware of the race or ethnicity of pick belt workers on other shifts.  This may be true, but it is not controlling.  Plaintiff had a right to be free from discrimination on his own shift, and the evidence, read in the light most favorable to him, suggests he may have been deprived of that right.

**B.      Hostile Environment**

"Under § 1981, a prima facie case of racial harassment/hostile work environment requires [a plaintiff] to show, under the totality of the circumstances (1) the harassment was pervasive of severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus."[24]  "General harassment if not racial . . . is not actionable."[25]  The workplace must be "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[26]

"Pervasiveness and severity are independent and equal grounds on which to support violations of § 1981."[27]  Courts may look to a number of factors to evaluate the nature of workplace harassment, "including[ ] 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' "[28]  A plaintiff complaining of a hostile environment "must show more than a few isolated incidents of racial enmity."[29]  "Instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments."[30]

---

[24] *Mitchell v. City and Cnty. of Denver*, 112 F. Appc'x 662, 671 (10th Cir. 2004) (quotation marks and citation omitted).

[25] *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994).

[26] *Sandoval v. City of Boulder,* 388 F.3d 1312, 1327 (10th Cir. 2004) (citation omitted).

[27] *Witt v. Roadway Express*, 136 F.3d 1424, 1432 (10th Cir. 1998).

[28] *Sprague v. Thorn Ams., Inc.*, 129 F.3d 1355, 1365 (10th Cir. 1997) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

[29] *Witt*, 136 F.3d at 1432, (quoting *Bolden,* 43 F.3d at 551).

[30] *Bolden*, 43 F.3d at 551.

Plaintiff supports his hostile environment claim by citing the reported finding of a noose at the Frito-Lay plant in 2013 and again in 2018, as well as allegedly racist graffiti at the plant. Plaintiff in particular relies on the decision of the Tenth Circuit in *Tademy v. Union Pac. Corp.*,[31] where the court observed that a noose "is a symbol not just of racial discrimination or of disapproval, but of terror."[32]

However, there are several facts which markedly distinguish the present action from *Tademy.* In that case, the plaintiff railroad employee personally found "what appeared to be a life-size hangman's noose prominently suspended from a large industrial wall clock."[33] Further, the evidence established that the noose was left by a white worker, which suggested he deliberately left the noose for the plaintiff to find. Although the railroad terminated the culprit, he was later reinstated by a public law board, and was not required to undergo any EEO training. Finally, the noose was the culmination of a long history of frequent abuse, including racist language and graffiti, directed specifically at the plaintiff.

Here, plaintiff has presented evidence of two incidents, occurring five years apart. The 2013 incident is expressly grounded on Plaintiff's statement that he had heard rumors of the incident. The 2018 incident was not directed at Plaintiff. He never saw the noose. Defendant conducted a prompt investigation, and interviewed numerous witnesses, but was unable to determine who the culprit was.

---

[31] 614 F.3d 1132 (10th Cir. 2008).

[32] *Id*. at 1142 (quoting *Vance v. S. Bell Tel. & Tel*., 983 F.2d 1573, 1583 (11th Cir. 1993) (Fay, J., dissenting). *See also Lounds v. Lincare, Inc*., 812 F.3d 1208, 1231 (10th Cir. 2015) (comment by a co-worker about lynching made directly to plaintiff could contribute to hostile environment, finding the comment analogous to the noose in *Tademy*).

[33] *Tademy*, 614 F.3d at 1137.

Plaintiff has not identified any specific area in which the investigation actually fell short. He advances a subjective belief that Defendant "glossed over" the incident, but the only ground offered for this belief is the fact that one of the investigators left open the possibility that the rope had been left by a contractor, rather than an employee.

In fact, the report to employees specifically stated the company considered the incident "serious."  Indeed, the company explicitly explained that the incidentally was "serious" in part precisely *because* the contractors denied using that type of rope.  This meant that the rope might indeed have been left by a Frito-Lay employee, and there was no good legitimate reason for the rope's presence.

Defendant did not "gloss over" the incident, but conducted a plant-wide investigation and addressed the issue with all workers.  The fact that the notice did not absolutely rule out a contractor employee as the source of the noose does not show the company treated the issue lightly, as Plaintiff has presented no evidence it was in fact impossible for a contractor to leave the noose.  Plaintiff has admitted he does not know whether contractors had access to the place the noose was found during other shifts, and offers no evidence which would preclude that possibility.

In *Tademy*, the noose was found in a small railroad shanty, and the investigation easily led to the perpetrator, who (after a successful public law board appeal) returned to work without being subjected to EEOC training.  Defendant's warehouse is a huge industrial enterprise employing many workers.  Defendant was unable to locate the culprit after a substantial investigation, and there is no evidence that it somehow ignored evidence which might have led to the apprehension of the perpetrator.

Plaintiff has failed to identify any case finding the reported finding of a noose by one employee necessarily generates a hostile environment for everyone employed at the plant.  In fact, several courts in this District have determined that the existence, or rumored existence, of a noose somewhere in a large manufacturing plant will not by itself create a hostile working environment for all employees.[34]   Other courts outside Kansas have reached the same conclusion.[35]

Unlike the noose reported in 2018, Plaintiff did personally observe what he describes as racist graffiti in a warehouse bathroom.  However, the graffiti was not directed at Plaintiff, and did not include any racist language or terms.  If anything, the alleged graffiti, directed at former President Obama, appears to manifest not racist but anti-Muslim bigotry.  Plaintiff made no complaint or report of the graffiti at the time, and Plaintiff has testified that it was removed the next time he used that bathroom.  There is no evidence that racist graffiti occurred frequently at the Frito-Lay plant.

Plaintiff correctly notes that other, not-overly racist events can be considered for the purposes of determining the extent of a hostile environment.[36]   But, not only has the alleged

---

[34] *See Hanks v. Spirit Aerosystems, Inc.*, 2017 WL 3839415, at *13 n. 2 (D. Kan. 2017) (plaintiff was not subjected to hostile environment where was noose reportedly found by worker in another area of large plant, plaintiff did not see the noose, and employer took remedial action); *Douglass v. General Motors Corp.*, 368 F. Supp. 2d 1220, 1231 (D. Kan. 2005) (plaintiff who did not personally view reported noose at industrial plant did not experience hostile environment); *Henderson v. Int'l Union*, 263 F. Supp. 3d 1245, 1277 n. 19 (D. Kan. 2003) ("If the awareness of a noose, in and of itself, established a hostile environment, then each and every employee at GM who also heard about the nooses could theoretically assert a claim against GM.").

[35] *See Adams v. Austal, U.S.A., LLC*, 754 F.3d 1240, 1256-57 (11th Cir. 2014) ("A reasonable jury would not find that [plaintiff's] work environment was objectively hostile" where, among other complaints, "[s]he . . . did not personally see the noose, but learned about it from other people"); *Henry v. Regents of the Univ. of Cal.*, 37 F. Supp. 3d 1067, 1086 (N.D. Cal. 2014) (plaintiff failed to present prima facie case of hostile environment based on single noose incident); *Dove v. United Parcel Serv., Inc.*, 912 F. Supp. 2d 353, 361 n.10 (M.D.N.C. 2012) (hostile environment claim failed as "neither alleged noose incident was directed at Mr. Dove").

[36] *See Lounds*, 812 F.3d at 1227.

failure-to-transfer Plaintiff to Maryland not been linked to Plaintiff's race at all, for reasons explained earlier, it does not rise to the level of an adverse job action. Whether considered by itself or in conjunction with other events at the Frito-Lay plant, Plaintiff has failed to present a prima facie case that he was subjected to a hostile work environment.

## C.     Retaliation.

Plaintiff contends that, after he complained about the pick belt work assignments, he was subjected to retaliation. Specifically, Plaintiff cites his deposition testimony that the assignments would decrease for a period after the complaints, "but then it would pick right back up at the pick belt." Defendant argues that Plaintiff has failed to present a prima facie case for two reasons. First, it contends that "Plaintiff never complained he was . . . required to work on the pick belt *because of* his race."[37] Second, it argues that Plaintiff suffered no adverse employment action because he was not treated worse.

The Court finds that Plaintiff did engage in protected activity. Plaintiff testified he talked to Specht about the pick belt assignments, stating "that Matt Kleiner . . . is the lead for the racial discrimination." He further testified about the temporary reduction in pick belt work happened "every time [he] complained about the pick belt." There is evidence that Defendant understood Plaintiff to stand with Miles and Dunmars on the work assignments, as Banwart expressly grouped the three together as employees who "have felt they have been profiled by Jason [Kennedy]" and "are feeling harassed and discriminated by his actions." The Court concludes that Plaintiff did engage in protected activity in opposing the pick belt assignments.

---

[37] Doc. 40 at 27 (emphasis in original). Defendant also stresses that Plaintiff made no complaint that the failure to transfer was racially motivated. However, the only protected activity set out in the Plaintiff's Response is limited to his complaints about the pick belt assignments.

The evidence does not support a prima facie case of retaliation, however, because the evidence does not show that Plaintiff suffered an adverse action from engaging in the protected activity. As noted above, Plaintiff's testimony is that when he complained about the pick belt assignments, the situation got better for a time, and then "it would pick right back up."

Thus, when Plaintiff complained about the pick belt assignments, the situation improved, if only temporarily. By his own account, Plaintiff suffered no worsening of his situation because of his complaints—after a brief respite, Defendant simply returned to its original discriminatory assignment of the pick belt work. To show causation, a plaintiff complaining of retaliation must "produce evidence from which one can infer that the [employer] would not have taken the adverse action if plaintiff had not engaged in protected activity."[38] Here, Plaintiff's evidence is that his complaints yielded a temporary improvement in his conditions, without any additional adverse effects; this would not deter a reasonable person from making additional complaints.[39] That Defendant simply continued its prior discrimination was not an act of retaliation supporting a separate claim for relief.[40]

In summary, the Court denies Defendant's motion for summary judgment as to Plaintiff's racial discrimination claim based on the pick belt work assignments. Defendant's motion is otherwise granted.

---

[38] *McDonald v. City of Wichita*, 156 F. Supp. 3d 1279, 1302 (D. Kan. 2016).

[39] *See Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (Title VII plaintiff claiming retaliation "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.") (internal quotations omitted).

[40] *Mallik v. Sebelius*, 964 F. Supp. 2d 531, 551 (D. Md. 2013) (plaintiff failed to show but-for causation to support retaliation claim, based on "claims that 'Mr. Flynn [his supervisor] *continued* to engage in a pattern of discrimination,' . . . as he purportedly had done before Plaintiff filed the [EEOC] complaint") (emphais in *Mallik*).

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**, as provided in the present Order.

**IT IS SO ORDERED**.

Dated this 26th day of July, 2022.

*Eric F. Melgren*

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE